**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BARBARA WRIGHT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 14-cv-365 (TSC) |
| | ) |
| LORETTA E. LYNCH, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OPINION**

In this civil action under Title VII of the Civil Rights Act of 1964 ("Title VII"), Plaintiff

Barbara Wright brings claims against the United States Bureau of Alcohol, Tobacco, Firearms

and Explosives ("ATF") for race- and sex-based hostile work environment.[1]  Defendant has

moved for judgment on the pleadings and summary judgment (the "Motion").

Upon consideration of the Motion, the parties' briefs and supplemental filings in support

thereof and in opposition thereto, and the parties' arguments at the November 23, 2015 motion

hearing, and for the reasons set forth below, the Motion is hereby **GRANTED IN PART AND**

**DENIED IN PART**.

## I.   BACKGROUND

Plaintiff Barbara Wright, an African-American woman, has worked as an IT manager for

over 20 years.  (Opp'n at 1).  Over the course of her career, she has successfully managed the

updating of and transition to new technologies for IT systems in both the federal government and

---

[1] Plaintiff's Amended Complaint also alleges violation of the Equal Pay Act and retaliation in
violation of Title VII.  (Am. Compl. ¶¶ 1, 7, 9-10).  Plaintiff has made clear in her opposition
brief and via her counsel's representations at the motion hearing that she is no longer pursuing
these claims.  Accordingly, the court will grant Defendant's Motion as to these claims.

the private sector.  (*Id.*).  Plaintiff began working at ATF in August 2001, when she was hired as a Computer Specialist in the Office of Science and Technology.  (Mot. Ex. G at 000637-639).  In 2008, she became Chief of the Financial Systems Branch (the "Branch") of ATF's Office of Management, replacing Mark Danter, a white male.  (Opp'n at 6-7).  During the time period relevant to this case, Plaintiff's first-line supervisor was David Horn, and her second-level supervisor was Vivian Michalic, both of whom are white.  (Mot. Ex. E at 000046).

Danter had left his position as Branch Chief to oversee the ATF "Implementation Team" responsible for moving ATF's internal financial operations system, which was called Financial Resources Desktop ("FReD"), over to DOJ's new Unified Financial Management System (the "System"), which was to be used across about twenty different DOJ sub-agencies.  (Opp'n at 6-8).  Plaintiff was not a member of the Implementation Team.  (*Id.*).

When the System went "live" in November 2010, it was a "disaster" – "[t]he financial systems that [Plaintiff] operated would not work," employees and vendors did not get paid, ATF Special Agents could not use their credit cards, and there were hundreds of errors, failures and glitches that needed to be fixed.  (*Id.* at 2).  At around the same time, and despite the fact that the System was still riddled with problems, the Implementation Team headed by Danter was disbanded.  (*Id.* at 7).  Danter began working elsewhere in the organization, including on certain "special projects," though he also continued to work on the System for "[a]bout a year, . . . tying up loose ends [and] mak[ing] sure it was operational."  (Opp'n Ex. 6 at 14:1-16).

Plaintiff, who was already fully occupied with her responsibilities as Branch Chief, was assigned to fix all of the many errors with the System in addition to her normal responsibilities, and with less than half of the staff that Danter had on the Implementation Team.  (Opp'n at 7-8).  As Branch Chief, Plaintiff was also responsible for the Branch's Helpdesk, the workload of which increased eight-fold after the System went live, from about 200 requests per month to

about 1,600.  (*Id.* at 8).  Fixing problems with the System was also much more difficult than

fixing problems with the ATF-specific FReD system, since doing so required Plaintiff to consult

with the 19 other DOJ sub-agencies that used the System.  (*Id.* at 8-9).

Plaintiff describes the responsibilities that were "heaped on her" as "completely

unrealistic," and states that "there were so many major system issues . . . that [she] needed to

work extraordinarily long hours, weekends, vacations and holidays" for about a year and a half,

sometimes up to 18 hours a day.  (*Id.* at 9, 18).  The record includes a number of emails

supporting Plaintiff's averments as to the extraordinarily long hours she worked on the System.

(*See*, *e.g.*, Opp'n Exs. 7-22).  Plaintiff claims that she asked management for help and suggested

solutions to problems, but that Horn, "the loudest and most vocal" member of management,

rejected every suggestion she made.  (Opp'n at 9).

The main thrust of Plaintiff's Title VII claims concern the blame, yelling, humiliation,

abuse and ridicule that she received after she took over the reins of the System from Danter in

November 2010, when the System went live and the Implementation Team was disbanded.

Plaintiff asserts that "the totality of the actions and hostile treatment taken by Defendant" from

then onward "amounted to a hostile work environment."  (*Id.* at 19 n.6).

Plaintiff claims that she was subjected to constant yelling, humiliation and abuse by her

two supervisors, Horn and Michalic, who singled her out in numerous meetings, loudly ridiculed

and humiliated her, and blamed her for everything that went wrong with the System and the

failure to correct its many problems.  (*See*, *e.g.*, *id.* at 12-14).  For example, in one January 2011

meeting, Plaintiff states that Michalic yelled at her, "blam[ed] her for the problems that

Mr. Danter had left behind" and "abruptly peppered [her] with demeaning questions,

interrupt[ing] her as she attempted to respond," causing her to leave "the meeting in tears, with a

headache, stressed and wondering what she could have done to cause [Michalic] to be so mean." (*Id.* at 12-13).

One contractor who worked on the System testified that he "attended numerous meetings where [Plaintiff] was loudly ridiculed and humiliated by either Ms. Michalic, Mr. Horn or both because of some failure in the . . . [S]ystem," and that he was "personally embarrassed to be present when [Plaintiff] was being treated in such a loud and abusive manner." (Opp'n Ex. 2 ¶ 6). The contractor also avers that Plaintiff "was personally demoralized by this treatment," that "she was often tearful and discouraged," and that "[h]er job was made a lot more difficult by the abusive treatment she received from Mr. Horn and Ms. Michalic." (*Id.* ¶ 7).

Plaintiff points to another example, when, after a series of meetings in one particular conference room, a facilities employee told Plaintiff and her managers that they could no longer use the conference room because the yelling and screaming – all of which had been directed at Plaintiff – was disruptive to other employees sitting nearby. (Opp'n Ex. 1 ¶ 18). Plaintiff claims that she was "abused almost every day" in this manner. (*Id.* ¶ 34).

As noted above, Danter continued to work on the System for about a year after it went live and the Implementation Team was disbanded. (Opp'n Ex. 6 at 14:1-16). But despite the fact that he was present at many of the meetings at which Plaintiff was berated, ridiculed and humiliated, and the fact that he had been in charge of the Implementation Team, Danter was not subjected to such harsh treatment. For example, Plaintiff testified at her deposition that, while Danter was present in the meeting where she was yelled at so loudly that there were complaints about the level of noise in the conference room, Horn and Michalic's ire was directed only at her, not Danter. (Supp. Notice Ex. 2 at 289:17-24). Plaintiff also testified that while Horn was not "warm and fuzzy" with her, he was "warm and fuzzy" with other managers, including Danter. (*Id.* at 293:13-25).

Plaintiff provides more specifics in a supplemental declaration, in which she alleges that Danter attended approximately ten meetings during which Horn and Michalic "berated" her about problems with the System.  (Supp. Notice Ex. 3 ¶ 3).  For example, less than an hour after she was first informed that she would be taking over the reins of the System from Danter "effective immediately," Plaintiff attended a meeting where the personnel change was announced.  (*Id.* ¶ 2).  "Almost instantly, Mr. Horn and other managers started yelling at [her] regarding the ongoing issues" with the System, yet "[n]o one raised their voice" at Danter, who was also present at the meeting, "despite the fact that he had been responsible for the transition up to that very day."  (*Id.*).  Indeed, Plaintiff states that Horn yelled at her "constantly" in all manner of meetings where Danter was present "during the first six or seven months following the transition," sometimes swearing at her, and that Danter "was never talked to like this."  (*Id.* ¶ 7).  Plaintiff also recalls one specific meeting at DOJ where Michalic "berated" her in front of Danter and others, getting in her face, yelling at her and insulting her intelligence.  (*Id.* ¶ 6). Plaintiff states that Danter was not treated the same way at that meeting, or at any other meetings.  (*Id.*).

Plaintiff also alleges that she started sending Michalic to Danter for answers after she had been yelled at three or four times "for things that Danter had done."  (*Id.* ¶ 4).  When Danter did not have an answer, however, "no one got angry with him."  (*Id.*).  Plaintiff recalls one specific meeting where Michalic yelled at her about something that Danter had done during the implementation phase, after which time she directed Michalic to take the issue up with Danter. (*Id.* ¶ 5).  Michalic then turned to Danter, who "gave some vague answer that didn't really address the problem," and yet Michalic "was fine with [the] answer," despite the fact that, whenever Plaintiff responded to her questions, Michalic "was never satisfied and reacted by yelling [at] and berating" her.  (*Id.*).

5

There is also at least some evidence in the record indicating that, in addition to regularly yelling at and humiliating Plaintiff:

- Horn and two other managers "constantly walked past [Plaintiff's] office, followed her and questioned her whereabouts," with Horn "typically stopp[ing] by her office multiple times each day" (Opp'n at 15);

- Horn improperly rejected one of her timecards without confirming that she was actually absent, causing her pay to be delayed for three days, which caused her stress (*id.* at 16; Opp'n Ex. 1 ¶ 27 );

- Horn surreptitiously listened in on one of her phone calls (Opp'n Ex. 1 ¶ 26);

- Horn falsely accused her of having outside employment, which, if true, could have been grounds for dismissal (*id.* ¶ 33);

- Michalic falsely accused her of "stealing money from [another] employee's retirement party" (*id.* ¶ 16);

- Michalic stole a USB drive that she was using to store documents detailing "what was happening to [her] at work," and that the USB drive eventually reappeared, with certain files deleted (*id.* ¶ 30);

- During a meeting about a week after the USB drive reappeared, Michalic referenced specific words from the documents on her USB drive – such as "intrusive," "aggressive," "belligerent" and "management by intimidation" – in order to intimidate Plaintiff by conveying that she knew what was on the USB drive (*id.*); and

- Similar to the disappearance and reappearance of the USB drive, a folder full of Plaintiff's personal papers disappeared only to reappear later with several papers altered and replaced with copies (*id.* ¶ 31).

Toward the end of 2011, Plaintiff took time off from work to be with her gravely ill mother.  (Opp'n at 16-17).  Plaintiff claims that Michalic and Horn stated on several occasions "that they didn't believe that anything was wrong with [her] mother."  (Opp'n Ex. 1 ¶ 28).  After her mother died on December 11, 2011, Plaintiff kept in regular contact with the office, especially Horn, and worked for at least a few hours each day.  (Opp'n at 16).  On January 9, 2012, her first day back at the office following her bereavement leave, Michalic and Horn humiliated Plaintiff in a meeting by staring and smirking at her when another ATF employee

referenced the dedication of two employees who continued working while they were dying of cancer.  (*Id.* at 16-17).  And at a January 31, 2012 meeting, Michalic and Horn falsely accused Plaintiff of misusing situational telework and the leave process, and of not sufficiently communicating with Horn during her bereavement leave.  (*Id.* at 17).

Plaintiff states that "[t]his constant ridicule, combined with unreasonable demands and unreasonable workload, caused [her] to experience incapacitating stress, anxiety, depression and insomnia."  (Opp'n at 13-14).  She claims that "[t]he combination of the long hours and abuse," including "being blamed for failures, suffering near daily yelling and screaming from Mr. Horn and Ms. Michalic, and being accused of not working, . . . eventually caused her to have a nervous breakdown" in March 2012.  (*Id.* at 18; Opp'n Ex. 1 ¶ 20, 34).  A psychiatrist "diagnosed her with severe depression with psychotic symptoms," finding that "the progressively increasing demands placed on her [while she] was working beyond the normal reasonable expected hours made her vulnerable to an emotional breakdown," as did the fact that, after the loss of her mother, she was "subjected to harsh verbal treatment" by her colleagues.  (Opp'n at 3, 18 ).

Plaintiff subsequently went into "leave without pay" status in or around January 2013, where she remained until her application for disability retirement was approved in July 2015 and she separated from ATF in August 2015.  (*See* Mot. Exs. B-D).

## II.    LEGAL STANDARD[2]

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

---

[2] Defendant has also moved for judgment on the pleadings as to Plaintiff's Equal Pay Act claim (*see* Mot. at 12-20) and her alleged failure to exhaust administrative remedies as to certain discrete allegedly discriminatory actions (*see id.* at 8-12).  Because Plaintiff has abandoned her Equal Pay Act claim (*see supra* n.1), and because the court finds that Plaintiff has adequately linked the allegedly unexhausted actions to her hostile work environment claim (*see infra*

P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim or defense."  Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination.  An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 248) (citation omitted).  The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc., v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987) (citing *Walker v. Washington*, 627 F.2d 541, 545 (D.C. Cir. 1980)).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) ("We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.")

---

Part III.a), Defendant's arguments for judgment on the pleadings are moot, and the court will treat the Motion solely as a motion for summary judgment.

(citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)).  The nonmoving

party's opposition, however, must consist of more than mere unsupported allegations or denials,

and must be supported by affidavits, declarations or other competent evidence setting forth

specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  The non-movant is "required to provide evidence

that would permit a reasonable jury to find [in his favor]."  *Laningham v. U.S. Navy*, 813 F.2d

1236, 1242 (D.C. Cir. 1987) (citations omitted).

## III.    ANALYSIS

### a.  Plaintiff Has Adequately Linked The Challenged Conduct In Her Hostile Work Environment Claim

Defendant argues that, because Plaintiff first contacted an EEO counselor on January 20,

2012, "any discriminatory acts occurring before December 6, 2011, forty-five (45) days before

Plaintiff contacted an EEO counselor, are untimely if they are not properly encompassed within a

timely hostile work environment claim."  (Mot. at 11).  Although Defendant correctly states the

law, the court finds that Plaintiff has, in fact, properly encompassed all of her allegations of

mistreatment from November 2010 onward within a timely claim for hostile work environment.

While the Supreme Court has stated that "discrete discriminatory acts are not actionable

if time barred, even when they are related to acts alleged in timely filed charges," *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), it has also made clear that hostile work

environment claims "are different in kind from discrete acts" because "[t]heir very nature

involves repeated conduct."  *Id.* at 115 (citation omitted).  A hostile work environment claim, the

Court has said, "is composed of a series of separate acts that collectively constitute one unlawful

employment practice."  *Id.* at 117 (quotation and citation omitted).  The D.C. Circuit has since

held that "hostile work environment claims are subject to a different limitations rule," which is

that so long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Singletary v. D.C.*, 351 F.3d 519, 526-27 (D.C. Cir. 2003) (citation omitted).

The D.C. Circuit has cautioned, however, that *Morgan* is not "an open sesame to recovery for time-barred violations." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011). "Both incidents barred by the statute of limitations and ones not barred can qualify as 'part of the same actionable hostile environment claim' only if they are adequately linked into a coherent hostile environment claim – if, for example, they 'involve[] the same type of employment actions, occur[] relatively frequently, and [are] perpetrated by the same managers.'" *Id.* (quoting *Morgan*, 536 U.S. at 120-21); *see also Morgan*, 536 U.S. at 118 (excluding any incident that "had no relation to the [other] acts . . . or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim").

Viewing the record evidence in the light most favorable to the non-moving party, as is required at this stage of the proceedings, the court finds that Plaintiff has adequately linked all of her allegations of mistreatment at the hands of Horn and Michalic dating back to when she took over the reins of the System from Danter in November 2010 into one "coherent hostile environment claim." *Baird*, 662 F.3d at 1251 (citation omitted).  For example, the evidence indicates that Horn and Michalic's campaign of cruelty against Plaintiff began the very day that she took over the System in November 2010 (Supp. Notice Ex. 3 ¶ 2), and that Horn and Michalic yelled at, ridiculed and humiliated Plaintiff "almost every day" from then onward. (Opp'n Ex. 1 ¶ 34).  There is also evidence indicating that, during this time period, Horn and Michalic made a number of false accusations regarding Plaintiff (*id.* ¶¶ 16, 33); invaded her privacy by listening in on her phone calls and pilfering her personal effects (*id.* ¶¶ 26, 30-31);

and mistreated her with regard to her mother's illness and death (Opp'n at 16-17; Opp'n Ex. 1 ¶ 28), among other things.

In sum, Plaintiff has sufficiently encompassed all of the mistreatment about which she complains within a single claim for hostile work environment, as the record indicates that the same types of challenged employment actions occurred relatively frequently and were perpetrated by the same managers – Horn and Michalic – without any intervening action by ATF. *See Baird*, 662 F.3d at 1251; *Morgan*, 536 U.S. at 120-21.

      b.   Plaintiff Has Adduced Evidence From Which A Jury Could Find That
          She Was Subjected To Discriminatory Intimidation, Ridicule And Insult

In order to prevail on a hostile work environment claim, a plaintiff must first demonstrate "that he or she was subjected to 'discriminatory intimidation, ridicule, and insult.'" *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). In so doing, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimina[tion] because of" the employee's protected status. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quotation marks and emphasis omitted).

Defendant contends that Plaintiff has adduced no evidence showing that the conduct complained of was rooted in racial or gender bias, and that Plaintiff has failed to make out any "linkage between the hostile behavior and [her] membership in a protected class," as she "does not assert any statements or conduct which link the alleged discriminatory conduct to her race [and/or] sex." (Mot. at 36-37).

Plaintiff makes a number of counterarguments in her opposition brief. Because it is dispositive, the court will address only one of these counterarguments: That the difference between how she and Danter were treated suffices to raise an inference of discrimination based

on race and/or sex.  (*See* Opp'n at 22).  Plaintiff cites *Motley-Ivey v. D.C.*, 923 F. Supp. 2d 222,

230 (D.D.C. 2013), for the proposition that a reasonable jury could infer that the difference

between the way that she and Danter were treated was due to her race and/or sex, since

"unjustified and disproportionate disciplinary actions" against a member of a protected class can

raise an inference that the disciplinary actions are linked to that protected class.  (*Id.*).

In *Motley-Ivey*, the plaintiff – a female police officer assigned to the D.C. Metropolitan

Police Department's Harbor Patrol Division – based her hostile work environment claim on the

defendant's "continuous, concerted and pervasive" practice of imposing on her "unjustified

disciplinary action[s]" that were disproportionate to the disciplinary actions imposed on her male

colleagues.  923 F. Supp. 2d at 233.  This included being recommended for adverse disciplinary

action for an incident in which she had difficulty docking a boat, while the two male officers

involved in the same incident received lesser discipline.  *See id.*  It also included being cited and

suspended for two days without pay for leaving keys in a docked boat, despite the fact that an

investigation revealed that leaving keys in docked boats was a common practice within the

Harbor Patrol Division.  *See id.* at 234.  Noting that "a pattern of allegedly undeserved,

excessive, and/or disproportionate discipline can form the basis for a viable hostile work

environment claim, at least where the plaintiff provides credible evidence that the alleged

justification underlying that pattern of discipline is unlawful discrimination," the court held that

the plaintiff had "adduced sufficient evidence from which a reasonable jury might conclude that

those disciplinary actions were motivated by her gender, ***given the comparative discipline (or***

***lack thereof) levied against her male colleagues***."  *Id.* at 234-35 (emphasis added).[3]

---

[3] Defendant does not address *Motley-Ivey* in its reply brief.

Here, the evidence indicates that, while Plaintiff was berated, ridiculed and humiliated by Horn and Michalic over the many problems with the System, Danter was never subjected to anything even resembling the same kind of treatment.  In the court's view, this evidence suffices to raise an inference of unlawful discrimination based on race and/or sex.  In so finding, the court notes that Danter (i) led the Implementation Team before handing the reins over to Plaintiff, at least arguably making him responsible for the problems that Plaintiff was tasked with rectifying; (ii) continued to work on the problems with the System alongside Plaintiff while she was being mistreated by Horn and Michalic, at least arguably giving him some level of continuing responsibility for the problems that pervaded the system after Plaintiff took over for him; and (iii) was present at numerous meetings where Plaintiff was singled out for humiliating ridicule by Horn and Michalic, meaning that Horn and Michalic had ample opportunity to treat Danter just as they were treating Plaintiff.  And yet, the evidence indicates that while Plaintiff – an African-American woman – was grossly mistreated by Horn and Michalic, both of whom are white, Danter – a white man – was not.

Indeed, one meeting in particular places the distinction between the treatment of Plaintiff and Danter in stark relief.  During *the very first meeting* that Plaintiff attended after taking over the reins of the System from Danter, "[a]lmost instantly" after the personnel change was announced, "Horn and other managers started yelling" at Plaintiff about problems with the System, yet "[n]o one raised their voice" at Danter, "despite the fact that he had been responsible for the transition up to that very day."  (Supp. Notice Ex. 3 ¶ 2).  The court finds that the evidence relating to this first post-transition meeting, as well as the evidence relating to the other meetings at which Plaintiff was mistreated while Danter was not, could lead a reasonable jury to conclude that Horn and Michalic's mistreatment of Plaintiff was motivated by her race and/or gender, "given the comparative discipline (or lack thereof) levied against" Danter, her

sufficiently similarly situated white male colleague.  *Motley-Ivey*, 923 F. Supp. 2d at 234-35.

The court therefore finds that Plaintiff has adduced evidence sufficient to demonstrate that she

was subjected to discriminatory intimidation, ridicule and insult.

    c.  **Plaintiff Has Adduced Evidence From Which A Jury Could Find That The Treatment
To Which She Was Subjected Was Severe Or Pervasive Enough To Alter The
<u>Conditions Of Her Employment And Create An Abusive Working Environment</u>**

A plaintiff must also demonstrate that the discriminatory intimidation, ridicule, and insult

to which he or she was subjected was "sufficiently severe or pervasive to alter the conditions of

[his or her] employment and create an abusive working environment."  *Harris*, 510 U.S. at 21

(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  "In evaluating a hostile

work environment claim, the court 'looks to the totality of the circumstances, including the

frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes

with an employee's work performance.'"  *Ayissi-Etoh*, 712 F.3d at 577 (quoting *Baloch v.

Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)).  Importantly, the "standards for judging

hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility

code.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale*, 523 U.S. at

80).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive

work environment – an environment that a reasonable person would find hostile or abusive – is

beyond Title VII's purview."  *Harris*, 510 U.S. at 21.

Defendant contends that Plaintiff has failed to demonstrate that the alleged incidents of

harassment were severe or pervasive enough to constitute a hostile work environment.  (Mot. at

37-38).  Defendant also reiterates on reply that "Plaintiff has not adequately distinguished her

case from the many cases where summary judgment was found for the employer [despite the

employee] alleg[ing] daily mistreatment."  (Reply at 12) (citing, *inter alia*, *Beshir v. Jewell*, 961

F. Supp. 2d 114, 128 (D.D.C. 2013) (facts insufficient to establish a hostile work environment

despite allegations of daily yelling); *Singh v. U.S. House of Reps.*, 300 F. Supp. 2d 48, 56–57
(D.D.C. 2004) (even loud expressions of disapproval are the kinds of normal strains that can
occur in any office setting and do not make out a hostile work environment)).

As the court indicated at the November 23, 2015 motion hearing, it disagrees with
Defendant's contentions, and finds that a jury could reasonably conclude that the ridicule,
intimidation and insult to which Plaintiff was subjected was severe or pervasive enough to alter
the conditions of her employment and create an abusive working environment.  In short, the
evidence adduced by Plaintiff paints a portrait of hostility and abuse that is markedly more
severe and pervasive than that which was present in any of the cases cited by Defendant.

For example, Plaintiff has adduced evidence indicating that, for a period of well over one
year, she was "abused almost every day" by Horn and Michalic, who "constantly" ridiculed and
humiliated her in front of her colleagues, regularly screamed and yelled at her, sometimes cursed
at her, often drove her to tears, and on at least one occasion yelled at her so loudly that they
actually disrupted other employees.  (Opp'n at 12-13, 20; Opp'n Ex. 1 ¶¶ 18, 34; Supp. Notice
Ex. 3 ¶¶ 6-7).  There is also evidence indicating that Plaintiff was falsely accused of stealing
money from another employee's retirement party, lying about her mother's illness, having
outside employment and misusing situational telework and the leave process, any one of which
could have conceivably constituted grounds for dismissal if true.  (Opp'n at 17; Opp'n Ex. 1
¶¶ 16, 28, 33).  Additionally, there is evidence that Horn "constantly walked past [Plaintiff's]
office, followed her and questioned her whereabouts" (Opp'n at 15), and that Horn and Michalic
invaded Plaintiff's privacy by listening in on her phone calls and stealing some of her personal
effects.  (Opp'n Ex. 1 ¶¶ 26, 30-31).  Indeed, there is evidence indicating that, about a week after
the reappearance of a missing USB drive belonging to Plaintiff, Michalic cryptically cited the
contents of some of the personal documents on the USB drive in what appears to have been a

threatening manner, to menacingly convey to Plaintiff that she had read those personal documents.  (*Id.* ¶ 30).  Importantly, Plaintiff has also provided medical evidence indicating that she experienced a nervous breakdown, severe depression with psychotic symptoms and incapacitating stress, anxiety and insomnia at least in part as a result of the mistreatment that she received at the hands of Horn and Michalic.  (Opp'n at 13-14, 18; Opp'n Ex. 1 ¶ 20).

In the court's view, all of the foregoing evidence takes this case well out of the realm inhabited by the cases that Defendant cites, where alleged mistreatment was deemed insufficiently severe and pervasive, and into the realm of hostile working environment. Accordingly, the court finds that Plaintiff has adduced evidence from which a jury could find that the intimidation, ridicule and insult to which she was subjected by Horn and Michalic was severe or pervasive enough to alter the conditions of her employment and create an abusive working environment.

Because the court has also found, *supra*, that Plaintiff has adequately linked the allegations comprising her hostile working environment claim and has adduced evidence sufficient to demonstrate that she was subjected to discriminatory intimidation, ridicule and insult, the court finds that a jury could reasonably find in Plaintiff's favor on her Title VII claims for race- and sex-based hostile work environment.

## IV.    CONCLUSION

Upon consideration of Defendant's Motion, the parties' briefs and supplemental filings in support thereof and in opposition thereto, and the parties' arguments at the November 23, 2015 motion hearing, the Motion is hereby **GRANTED IN PART AND DENIED IN PART**.

The Motion is **GRANTED** as to the Equal Pay Act and Title VII retaliation claims that Plaintiff has abandoned.

The Motion is **DENIED** as to Plaintiff's claims for race- and sex-based hostile work environment in violation of Title VII.

An appropriate Order accompanies this Memorandum Opinion.


Date:  July 11, 2016


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge